COURT OF APPEALS
DECISION
DATED AND FILED

April 15, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2018AP2353-CR**

Cir. Ct. No. **2015CF188**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

---

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

KEVIN M. LIPSCOMB,

DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Waukesha County: MICHAEL J. APRAHAMIAN, Judge. *Affirmed*.

Before Neubauer, C.J., Reilly, P.J., and Gundrum, J.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.  A jury found Kevin M. Lipscomb guilty of being party to a crime (PTAC) of armed robbery.  He appeals from the judgment of conviction, alleging that the trial court erred by:  (1) refusing to allow him to demonstrate his distinctive walk for the jury without being sworn or subject to cross-examination, (2) admitting cell phone photographic evidence of guns and cash, and (3) sua sponte instructing the jury that the victim's homeowners insurance policy did not cover the loss.  He also seeks a new trial in the interest of justice.  If the court did err, any reviewable error was harmless.  We affirm.

## I.  Background

¶2    DK and her husband ran a salvage yard business, a part of which entailed buying scrap metal from customers for cash.  As a customer, Lipscomb was familiar with the cash-for-scrap aspect.  DK made almost daily cash withdrawals from their bank:  $20,000 to $30,000 Mondays through Thursdays, and about double that on Fridays so as to cover weekend transactions.  The same bank teller, Andria Noel, frequently assisted DK.  Noel was Lipscomb's girlfriend.

¶3    One Friday, just after DK—assisted by Noel at the bank—had withdrawn $61,000, DK told police a masked man showed up at her house, pointed a black-and-silver handgun at her, and demanded the bag of money.  DK testified that after she turned it over, the masked robber left "quickly."  Lipscomb and Noel both were charged with PTAC armed robbery.  After a seven-day joint trial, the jury found Lipscomb guilty and acquitted Noel.  Lipscomb appealed. Additional facts will be supplied as needed.

## II. Appeal

### A. Gait-Demonstration Evidence

¶4 Lipscomb wanted to challenge DK's account of the robber escaping "quickly." He walks with a limp due to left below-the-knee paralysis for which he wears an ankle brace. He contends the trial court erred in refusing to allow him to demonstrate his walk for the jury without being sworn in or subject to cross-examination and in denying his motion for a new trial on this ground.

¶5 "This court will not disturb a [trial] court's decision to admit or exclude evidence unless the circuit court erroneously exercised its discretion." *State v. Jackson*, 2014 WI 4, ¶43, 352 Wis. 2d 249, 841 N.W.2d 791 (citation omitted). A motion for a new trial also is addressed to the sound discretion of the trial court. *State v. Eckert*, 203 Wis. 2d 497, 516, 553 N.W.2d 539 (Ct. App. 1996). "A [trial] court erroneously exercises its discretion if it applies an improper legal standard or makes a decision not reasonably supported by the facts of record." *Jackson*, 352 Wis. 2d 249, ¶43 (citation omitted).

¶6 DK testified that the robber had a limp but left "quickly"; two detectives testified that Lipscomb had a "slight" limp; and Noel testified that, because of his limp, Lipscomb cannot run, "it's more of a skip hop skip." Defense counsel then asked the court for its "opinion" on whether, for the limited purpose of demonstrating for the jury how he walks, Lipscomb could take the stand without being sworn or subject to cross-examination. The court responded that, if Lipscomb did so, he "opens the door for [the prosecutor] to ask any questions she wanted on cross-examination." Defense counsel answered, "That's what I wanted to know." Lipscomb did not argue that demonstrating his walk was or was not "testimonial"; he instead opted to not testify or to show the jury how he walked.

¶7      Postconviction, the court explained that it thought the demonstration would have been testimonial because, unlike physical characteristics such as platinum teeth, *see State v. Gonzalez*, 2014 WI 124, ¶3, 359 Wis. 2d 1, 856 N.W.2d 580, Lipscomb could have falsified his walk:

> For him to give a demonstration, I would have to swear him in that the demonstration he's about to give is true and not fake. Because [he] could fake it unless he's told to tell the truth and do it accurately and truthfully. And he can't have it both ways.
>
> Once he takes that oath, he would have to be subject to cross-examination on that[,] which is something you didn't want him to do and there was not a citation to this case [*Gonzalez*] at the time. If I recall correctly, you asked whether he could give a demonstration. I asked if he is going to testify and you said no and then I said I don't think so.
>
> I think that was the extent of that conversation but Mr. Lipscomb could have certainly … falsified his limp in some way and without having him sworn to be given true and accurate depiction of that I don't think it would be helpful evidence and without that having him take the stand to swear to that, I don't think he's allowed to make a demonstration.

¶8      In *Gonzalez*, Gonzalez complied with the court's request in front of the jury, made over defense objection, to display his platinum teeth. *Id.*, ¶1. He later argued that showing his teeth compelled him to be a witness against himself at trial because they were more than physical evidence. *Id.* The supreme court held that the teeth evidence, while probative of his identity, did not have a testimonial aspect sufficient to implicate constitutional protections, as teeth do not express, make use of, reveal, or disclose the contents of one's mind. *Id.*, ¶3.

¶9      The *Gonzalez* court further explained:

> The term "privilege against self-incrimination" is not an entirely accurate description of a person's constitutional

protection against being "compelled in any criminal case to be a witness against himself [or herself]."

The word "witness" in the constitutional text limits the relevant category of compelled incriminating communications to those that are "testimonial" in character…. [T]here is a significant difference between the use of compulsion to extort communications from a defendant and compelling a person to engage in conduct that may be incriminating. Thus, even though the act may provide incriminating evidence, a criminal suspect may be compelled to put on a shirt, to provide a blood sample or handwriting exemplar, or to make a recording of his [or her] voice. The act of exhibiting such physical characteristics is not the same as a sworn communication by a witness that relates either express or implied assertions of fact or belief.

*Gonzalez*, 359 Wis. 2d 1, ¶8 (citation omitted).

¶10 We conclude a demonstration of Lipscomb's limp would not have been testimonial. The question, then, is whether excluding that evidence was a harmless and proper exercise of discretion.

¶11 A harmless error inquiry is a question of law we review de novo. *State v. Magett*, 2014 WI 67, ¶29, 355 Wis. 2d 617, 850 N.W.2d 42. The test is whether, beyond a reasonable doubt, the jury would have come to the same conclusion absent the error. *State v. Harvey*, 2002 WI 93, ¶48, 254 Wis. 2d 442, 647 N.W.2d 189. Appellate courts use several nonexclusive factors when applying the harmless error rule in the evidentiary context:

(1) the frequency of the error; (2) the importance of the erroneously included or excluded evidence to the prosecution's or defense's case; (3) the presence or absence of evidence corroborating or contradicting the erroneously included or excluded evidence; (4) whether erroneously excluded evidence merely duplicates untainted evidence; (5) the nature of the defense; (6) the nature of the State's case; and (7) the overall strength of the State's case.

*State v. Monahan*, 2018 WI 80, ¶35, 383 Wis. 2d 100, 913 N.W.2d 894.

¶12    In support of his claim that exclusion of the "gait evidence" was not harmless, Lipscomb cites *State v. Fivecoats*, 284 P.3d 1225 (Or. Ct. App 2012), an Oregon case arising on similar facts.  The main issue was the identity of a man seen on surveillance footage taking a gun from the victim's vehicle.  *Id.* at 1226. Fivecoats wanted to demonstrate his "twitchy walk" so the jury could compare it to the gait of the man in the video.  *Id.* at 1226-27.  The trial court ruled that Fivecoats could either demonstrate his walk to the jury or exercise his right not to testify, as demonstrating his walk would be testimonial, such that doing so would waive his right not to testify.  *Id.* at 1226.  The court of appeals disagreed.  *Id.*  It held that the trial court erred in finding the gait demonstration testimonial and that excluding the evidence was not harmless, as it would require the appellate court to impermissibly reweigh the evidence.  *Id.* at 1226, 1229.

¶13    We are not persuaded, let alone bound, by the Oregon appellate court's ruling.  Where facts of a case from another jurisdiction jibe with those of the case before us, that case law may be helpful, even persuasive, but where Wisconsin law is clear, such case law is not binding on Wisconsin courts.  *See State v. Muckerheide*, 2007 WI 5, ¶¶36-38, 298 Wis. 2d 553, 725 N.W.2d 930.

¶14    Determining whether the error affected the verdict does not require us to "reweigh" the evidence.  Rather than reweighing evidence or reassessing witness credibility, Wisconsin law is clear that this court searches the record for evidence that supports findings the trier of fact made, not for findings it could have made but did not.  *Dickman v. Vollmer*, 2007 WI App 141, ¶14, 303 Wis. 2d 241, 736 N.W.2d 202.  We thus review the record in light of the claimed error, then draw a legal conclusion about its likely effect on the verdict.

¶15     Lipscomb sought to dispute his ability to escape "quickly" from the scene.  To bolster his claim, he called Noel as a witness to demonstrate his impaired walk.  In the State's rebuttal case, a detective also showed how Lipscomb walked.  Both the detective and Noel testified they never had seen Lipscomb run.  Beyond that, the detective's and Noel's demonstrations of and testimony about Lipscomb's walk were under oath and subject to cross-examination.  Lipscomb wanted to counter that testimony with his own demonstration absent similar credibility safeguards.  Had he been allowed to do so, the State would have argued that he exaggerated his limp and that the detective's demonstration was the more accurate portrayal of Lipscomb's usual gait.

¶16     Given the ample evidence of his guilt, we fail to see how allowing Lipscomb to demonstrate his gait would have helped his defense.  DK told police and testified that the robber had a slight limp; Lipscomb has a limp.  Shortly after the robbery, a police dog alerted near the scene on a clean latex glove that bore Lipscomb's DNA, and police found beneath the basement stairs in Lipscomb's home a package of latex gloves that was missing one of four gloves that originally came in the package.[1]  Lipscomb's cell phone "pinged" at the time of the robbery off a tower about a half mile from DK's home.  Lipscomb's girlfriend was the teller who gave DK the $61,000 cash fifteen minutes before DK was robbed of it on returning home from the bank, and Lipscomb was a regular customer at the

---

[1] Noel and Lipscomb's brother testified that Lipscomb carries latex gloves with him for personal hygiene reasons relating to his partial paralysis.  Police found no used gloves in the bathroom, and there was no bathroom in the basement.

scrap business who was paid in cash for scrap metal he brought in. We are persuaded that, beyond a reasonable doubt, the verdict would have been the same.

## B. Photographic Evidence

¶17    Lipscomb next argues that the trial court erred in admitting, over his foundation and relevance objections, photographs of guns and cash found on his cell phone.

¶18    "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." WIS. STAT. § 904.01 (2017-18).[2] "Evidence [that] is not relevant is not admissible." WIS. STAT. § 904.02. The trial court's decision to admit or exclude evidence is within its discretion. *Jackson*, 352 Wis. 2d 249, ¶43.

¶19    The photos showed two different black-and-silver handguns and a young child on a bed surrounded by a large amount of cash. The State argued that the photos were relevant because the guns were similar to the black-and-silver handgun DK had described and a large amount of cash was taken in the robbery. The court held that Lipscomb could attack the weight and credibility of the photographic evidence on cross-examination.

¶20    To Lipscomb's benefit, defense counsel successfully established that an unknown third party sent the gun photos to Lipscomb's phone several months before the robbery, that police found no guns in the search of Lipscomb's home,

---

[2] All references to the Wisconsin Statutes are to the 2017-18 version unless noted.

and that the picture of the child surrounded by cash, also sent by an unknown third party, likely was of Lipscomb's daughter taken five or six years before trial.

¶21     Here, Lipscomb renews his complaint that the evidence lacked a factual basis connecting the photos to the robbery.  He argues that, while DK said the robber had a black-and-silver gun, the State did not show who owned the guns in the photos, who took the photos, when they were taken, how they came to be on his cell phone, or how the cash in the child photo was tied to that from the robbery.

¶22     The State responds that, even if the photographs were sent by a third party before the robbery, the jury reasonably could have inferred that the guns were being offered for sale and that Lipscomb bought one or both of them, thus having some tendency to prove that he may have obtained and used one of them to commit the armed robbery.  The State further contends the jury also reasonably could have inferred that, whoever the child was, the large amount of cash depicted in the child photo was some of the $61,000 in cash taken in the robbery.

¶23     The fact of consequence was whether Lipscomb was the masked man who robbed DK of $61,000.  The relevance of the photographic evidence was whether it had "any tendency" to make the existence of any fact of consequence more probable than it would have been without the evidence.  WIS. STAT. § 904.01.  The jury did not have to believe that any of the photos were related if it thought they were sent to Lipscomb's phone before the robbery.  Under the totality of the evidence, however, the photo evidence had some tendency to show that Lipscomb was the robber.

¶24     We thus are persuaded beyond a reasonable doubt that, even if the photos should not have been introduced, any error was harmless.  Defense counsel

effectively cross-examined the detective who discovered the photos on Lipscomb's cell phone about the gun photos possibly being sent to Lipscomb's phone months before the robbery; about police finding no guns in Lipscomb's home; and about the child-with-cash picture that could have been of his daughter taken five or six years before trial.[3]

¶25 The photographs simply were not essential to the State's case. The jury still would have learned that Lipscomb's girlfriend was the teller who delivered the $61,000 cash withdrawal to DK fifteen minutes before DK was robbed of the cash; that, in a search of Lipscomb's residence, police found a four-pack of latex gloves in the basement, minus one glove; that a latex glove bearing Lipscomb's DNA was found near the scene of the robbery in the direction that DK said the limping robber had fled; that Lipscomb walks with a limp; that Lipscomb's girlfriend and brother acknowledged that he often carried latex gloves with him; that police found $2770 in cash inside a toy in a child's bedroom; and that his cell phone "pinged" at the time of the robbery off a cell tower six-tenths of a mile from the robbery scene. The State proved conclusively that Lipscomb had the means, motive, and opportunity to commit the armed robbery. Beyond a reasonable doubt, the verdict would have been the same had the trial court not received the photographs into evidence.

---

[3] Neither Lipscomb nor the State advances the argument that the photographic evidence was other-acts evidence that called for an analysis to determine its admissibility under *State v. Sullivan*, 216 Wis. 2d 768, 771-73, 576 N.W.2d 30 (1998). Regardless, we conclude that any error in admitting the evidence was harmless, as we are persuaded that, beyond a reasonable doubt, the verdict would have been the same if the photographs—marginally relevant to the State's case—had not been received into evidence.

## C. Jury Instruction Regarding Homeowners Insurance Policy

¶28    One defense theory was that DK had not been robbed at all but had fashioned a plan to defraud her insurance company. DK testified that she and her husband neither were reimbursed by the bank nor recovered any of the stolen cash; that they did not claim a loss under their business insurance policy; and that they did not file a claim under their homeowners policy, as their agent had said it would not cover business funds stolen from their home.

¶29    Lipscomb cross-examined Detective Vito Sorce about the victims' insurance coverage. Sorce testified that the homeowners policy did not cover the $61,000 because it was a business loss. The trial court instructed the jury that Sorce's testimony in this regard was hearsay and that whether there actually was coverage under the policy had not been established. The court then sua sponte instructed the jury that a homeowners policy would not cover the theft of business property. Lipscomb did not object.

¶30    The court later explained why it had instructed the jury as it had:

> It's property that's owned by the corporation and it would not have coverage.... I think confusing the jury and I think leaving that impression with them is inappropriate because there is no coverage for anything.
>
> That's not personal property. They may be owners of the business but because they're owners doesn't mean it's their property, it's the corporation[']s, it's a separate entity.

¶31    Lipscomb contends the sua sponte instruction was error. He argues that, by doing so, the trial court inserted itself as a "surrogate witness," offered improper commentary on the evidence, and "functioned as a partisan." We disagree. The error was Lipscomb's own for not objecting to the trial court's instruction when it was given. Where an objection could have been made at trial,

this court—unlike the supreme court—has no power to reach an unobjected-to jury instruction, as we lack a discretionary power of review in that regard. *State v. Trammell*, 2019 WI 59, ¶¶24-25, 387 Wis. 2d 156, 928 N.W.2d 564; *see also State v. Schumacher*, 144 Wis. 2d 388, 409-10, 424 N.W.2d 672 (1988). Lipscomb thus waived or forfeited his right to appellate review of his challenge to the court's instruction by not objecting to it.[4]

## D. New Trial in the Interest of Justice

¶32    Rolling together an alleged cascade of errors, Lipscomb seeks a new trial in the interest of justice under WIS. STAT. § 752.35. We exercise our discretionary reversal power only in "exceptional cases." *State v. Avery*, 2013 WI 13, ¶38, 345 Wis. 2d 407, 826 N.W.2d 60. The defendant must prove by clear and convincing evidence that justice has miscarried, *State v. Williams*, 2000 WI App 123, ¶17, 237 Wis. 2d 591, 614 N.W.2d 11, or that the jury had before it improperly admitted evidence that so clouded a crucial issue that it fairly may be said that the real controversy was not fully tried, *State v. Sugden*, 2010 WI App 166, ¶37, 330 Wis. 2d 628, 795 N.W.2d 456. He has not met those burdens.

---

[4] Were we to accept Lipscomb's invitation to review this claim of instructional error, we would conclude that it was harmless. Even supposing DK and her husband originally intended to dupe their insurer, that strategy did not pan out and, as recited earlier in this opinion, there was ample evidence connecting Lipscomb to the reported robbery. The court sought only to avoid juror confusion in regard to insurance coverage, and we conclude no prejudice resulted from the instruction. *See Nimmer v. Purtell*, 69 Wis. 2d 21, 36, 230 N.W.2d 258 (1975) (improper reference to insurance cause for new trial only where prejudice results). A new trial is to be ordered only if there is a reasonable likelihood that the jury was misled by the instruction and applied it in an unconstitutional manner. *State v. Lohmeier*, 205 Wis. 2d 183, 193-94, 556 N.W.2d 90 (1996).

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

13